IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____:
Sabinsa Corporation,                    :
                          Plaintiff,    :
                                        :        Civil Action No: 14-cv-04738 RBK-SAK
              v.                        :
                                        :        **DEFAULT JUDGMENT ORDER AND OPINION**
                                        :
Prakruti Products Pvt. Ltd.,            :
                          Defendants.   :
_____:

**KUGLER, United States District Judge**:

      **This Matter Having Come Before** the Court on the motion by plaintiff Sabinsa Corporation for default judgment (Doc. 333) ["this motion"] in this breach of contract action arising from Prakruti's breach of the Settlement Agreement[1] and which terminated the parties' patent litigation concerning the infringement of the '415 patent,

      **The Court Having Reviewed** and considered the parties' submissions on this motion (Docs. 334, 338, and 341, all Sealed) as well as the entire ECF record in this matter without an oral hearing pursuant to *Fed. R. Civ. P.* 78, *L. Civ. R.* 78.1 , and for good cause shown,

      **Now Issues herein** an Order and Accompanying Opinion.

**ORDER**

      **IT IS HEREBY ORDERED** that Sabinsa's motion for default judgement (Docs. 333, 334) dated 15 May 2023 is **GRANTED;** and

      **FURTHER ORDERED**: Prakruti shall pay liquidated damages for those sales evidenced to have been spoliated /obstructed according to the Magistrate Judge's recommendation of adverse inference (Doc. No. 220)W, which is adopted herein in its entirety, and therefore to have breached the Settlement Agreement. The liquidated damages for which Prakruti is liable shall be decided after briefing by the parties as to the proper amount; and

      **FURTHER ORDERED**:   the parties shall submit briefing no later than **21 days after this Order**

---

[1] which, as described herein, the Magistrate Judge inferred from spoliated evidence of Prakruti sales during the period  in which the parties' settlement agreement was in force and which inference this Court has adopted in its entirety.

**and Opinion have been filed,** which shows in as specific and precise terms as possible a reasonable amount of liquidated damages Prakruti must pay to Sabinsa


**OPINION**

**1.0     FACTUAL AND PROCEDURAL BACKGROUND**

Although not covering the entirety of the background of this matter, the Court nonetheless visits in considerable detail key twists and turns in order to underpin its Default Judgment decision here.  Included are:

- why the parties executed a Settlement Agreement ["SA"] to end patent infringement litigation between them;
- the Magistrate Judge's opinion that declared Prakruti's spoliation / obstruction of evidence of its alleged breach of the SA, her recommendation of an adverse inference against Prakruti for that alleged breach; and  Prakruti's liability for the discovery fees and costs of such spoliation ["spoliation fees"];
- the dispute between the parties about the legally proper amount of spoliation fees;
- Prakruti's refusal to pay the spoliation fees;
- this Court's setting forth the adverse inference of Prakruti's breach of the SA because of its  spoliation;
- this Court's clarification why it issued the Default Order (Doc. 331); and
- this Court's reasoning as to the Default Judgement herein.


**1.1     Big Picture**

It is important to recognize this matter is not a patent infringement action, even though that was the gravamen of this matter when begun in 2014.  It is critical to recognize that this matter now, and for the last six years, has been an action for breach of contract, namely, the breach of the Settlement Agreement ["SA"] that ended the patent infringement action between the parties.   The SA prescribes how sales of curcuminoid products that may have also been claimed in U.S. patent  5,861,415 ("the '415 patent") (Doc. 1, Exh. A) were to transpire between the parties.  Moreover, in this contract action, the Court has already issued a default order (Doc. 331) against Prakruti essentially for failing to mount a meritorious defense of its inferred breach of the SA.


**1.2     Patent Infringement Litigation and Getting to the Settlement Agreement**

On 30 July 2014, Sabinsa filed a patent infringement action against Herbakraft, a U.S.

nutraceutical distributor, and Prakruti, a manufacturer of curcuminoid products[2] (i.e., turmeric nutraceuticals) located in India.  The complaint (Doc. 1) alleged that Herbakraft had sold a curcuminoid product claimed in the '415 U.S. patent for which Sabinsa was an exclusive patent licensee having standing to sue from the License grant.  The complaint also alleged  Prakruti had manufactured a product in India that fell within the claims of the '415 patent and had sold it to Herbakraft, a curcuminoid distributor in the U.S., in violation of 35 U.S.C. §271 *et seq*. (Doc. 1, Exhs. 4 and 5), and that such infringing sales had occurred before the expiry of the '415 patent on 14 Jul 2016.

Sabinsa filed the infringement action under authority of its license grant awarded by the Exclusive Patent License Agreement ("License") ¶2.1 (Doc.338, Exh. 2, Sealed) with the '415 patent owner (deliberately left unnamed here).  As an exclusive licensee, Sabinsa had acquired all the legal rights to sue for patent infringement.[3]  Mindful of that document's sealed status, the Court notes briefly that License ¶2.1 unequivocally granted Sabinsa the right to sue for infringement that occurred before the '415 patent expiration.[4]  Since Sabinsa's patent infringement suit concerned Prakruti's infringing sales in the U.S. that had occurred before patent expiration and as the statute of limitations for patent infringement extends to 6 years post patent expiration[5], Sabinsa's patent suit against Prakruti was legally appropriate.

 On 7 Jan 2015, Sabinsa and Prakruti executed a Settlement Agreement (Doc. 39-2, Sealed) that ended  the patent infringement litigation between them.  Again mindful of the SA's sealed status, the Court generally describes below some relevant SA terms:

-Terminated the patent litigation,
-Sabinsa released Prakruti of any money damages for Prakruti's infringement in the litigation;
-Sabinsa promised not to sue Prakruti ever again for infringement of the '415 patent;
- A broadened definition of Accused Products (discussed in detail *infra*);
- A  prohibition that Prakruti cannot sell Accused Products to any party other than Sabinsa during the SA period (7 January 2015 to 14 July 2016), else be liable for liquidated damages.

Sabinsa and Prakruti stipulated to a Consent Judgment (Doc. 34) entered on 9 Mar 2015, thereby ending the underlying patent infringement action against Prakruti.   As for Herbakraft, on 18 March 2015,  this Court entered a similar Consent Judgment  (Doc. 37) to end that action, after which Herbakraft was terminated as a party in this matter.   In each Consent Judgment  (Doc. 34:¶¶1-3, 9; Doc. 37:¶¶1-3, 9), the relevant defendant, Prakruti or  Herbakraft, had expressly agreed this Court retained jurisdiction over matters related to the patent infringement action.

---

[2]  Curcuminoids are secondary metabolites, all yellow in color, isolated from the turmeric plant, *Curcuma longa*, a flowering member in the ginger family, and include curcumin, demethoxycurcumin, and bisdemethoxycurcumin.
[3] *See infra* section 3.1.
[4] *See infra* section 3.1.
[5] 35 U.S.C. §286.

Their Consent Judgment notwithstanding, disputes between Sabinsa and Prakruti about sales of curcuminoid products under the SA continued.  On 28 Oct 2016, Sabinsa filed a motion (Doc. 38) to reopen the action in order to enforce the Settlement Agreement, asserting Prakruti was selling its curcuminoid products in breach of the SA.

On 27 June 2017, this Court granted the re-opening motion solely to allow Sabinsa to conduct discovery of Prakruti's alleged breach of the SA.  The discovery was limited to whether Prakruti was selling "Accused Products" to third parties during the SA period (the execution date of the SA, 7 Jan 2015, and the expiry date of the '415 patent, 14 Jul 2016).  Mindful that the SA is sealed, the Court finds a recitation of certain terms in the SA necessary to resolve the present motion.  The SA ¶1.6 defines "Accused Products" as "any product(s) derived from the *Curcuma longa* plant that contains curcuminoid compositions/ products as enabled, described and claimed in the '415 Patent, including such *Curcuma longa*  product offered for sale by Prakruti".  If Prakruti were to sell such Accused Products during the SA period, then the liquidated damages clause of SA¶3.3 obligates Prakruti to pay liquidated damages in the amount of ten thousand U.S. dollars ($10,000) for each kilogram of Accused Product Prakruti sold/offered for sale.

### 1.3     Discovery and the Spoliation[6] Order and Adverse Inference Recommendation[7]

On 17 July 2017, the Magistrate Judge issued a discovery order requiring the parties complete discovery as to Prakruti's allegedly breaching sales of the SA by 31 Oct 2017.  But over a year later, on 5 Oct 2018, at a confidential evidentiary hearing (Doc. 218, Sealed), it was clear discovery had not moved forward to a significant degree.  Mindful that the transcript of this hearing is sealed, the Court relays information from this hearing that has been expressed publicly in later opinions of the Magistrate

---

[6]      This Court has defined spoliation as the " 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation' ", which may give rise to the following sanctions pursuant to the Federal Rules of Civil Procedure and the court's inherent powers  (*Crowley v. Chait et al.*, No. 85-cv-2441 (HAA), 2004 WL 7338421, at *7 (D.N.J. 29 Dec 2004):  dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence;¹ an adverse inference, referred to as the spoliation inference; fines; and attorneys' fees and costs. *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F.Supp.2d 332, 335 (D.N.J. 2004) [citations omitted].

Spoliation occurs when the party in control of key evidence has breached its duty to preserve it and specifically when: "(1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv.*, 665 F.3d 68, 73 (3d Cir. 2012).

"A litigant is . . . under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation." *Scott v. IBM Corp.*, 196 F.R.D. 233, 249 (D.N.J. 2000). To analyze a party's reasonable foreseeability, a  ourt exercises its discretion using a flexible fact-specific standard to probe and construct as necessary the fact situation of the alleged spoliation. *Bull*, 665 F.3d at 77-78 .  An important consideration in the Court's  analysis of reasonable foreseeability is the recognition that the duty to preserve evidence is an "affirmative obligation."  It arises "when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable and the party in possession of the evidence can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded."  *N.V.E., Inc. v. Palmeroni*, No. 06–cv-5455 (ES), 2011 WL 4407428, at *5  (D.N.J. 21 Sep 2011)  [citations omitted].

[7] When an adverse inference is the sanction chosen by the Court for evidence of spoliation, it can also be termed spoliation inference. *Mosaid Techs.*, 348 F.Supp.2d at 335.

Judge.  At this hearing, the Magistrate Judge explained that she had seen that Prakruti had spoliated samples of products that it had sold during the SA period, making Sabinsa's detection of Prakruti's breach of the SA impossible.

Also, at the 5 Oct 2018 hearing, the Magistrate Judge expressed her frustration at Prakruti's attempts to obfuscate its sales information. Specifically, she noted that, at each new discovery hearing, Prakruti would assure her it had produced to Sabinsa all relevant information only, at subsequent hearings, to declare it had more information yet to produce, and then later still at subsequent hearings, the Magistrate Judge heard Prakruti make the same assurance of complete production, which later still Prakruti dissembled about. This apparent sandbagging of information raised the Magistrate Judge's doubts as to Prakruti's credibility and trustworthiness in the discovery process.

Also, at this hearing, the Magistrate Judge explained that Prakruti Products ["P Products"], the named defendant, actually had used Prakruti Foods ["P Foods"], an entity completely controlled by the primary shareholder of P Products, to make the breaching sales of curcuminoid products during the SA period.  To be clear, P Products, wholly controlling of P Foods, had P Foods execute sales of P Products' curcuminoids, and then P Products tried to hide this fact by asserting to the Magistrate Judge that P Products and P Foods were wholly different companies, and therefore Foods' sales were outside the SA.  However, discovery into the true governance of P Products and of P Foods revealed that the owner of P Products  actually owned a controlling interest in both companies when the breaching sales were made.  To the Magistrate Judge, this obfuscation appeared an intentional effort by Prakruti to bypass the SA's absolute constraint that Prakruti sell curcuminoids only to Sabinsa during the SA period.

Also, and importantly to this Court, at that October 2018 discovery hearing, the Magistrate Judge informed the parties of an official legal notice from Prakruti's attorney in India communicating his interpretation of the SA term "Accused Products", which included any Prakruti curcuminoid product it had been selling prior to the SA, regardless of solvent used in the manufacturing process, that is, regardless of whether the product fell within the claims of the '415 patent.[8] Doc. 218, Sealed.  From this communication, the Magistrate Judge, as well as this Court, inferred that Prakruti was most likely on notice that the SA term "Accused Products" included ALL curcuminoid products Prakruti made, not just those claimed  in the '415 patent.

On 17 December 2018, the Magistrate Judge granted sanctions against Prakruti for spoliating evidence of Prakruti's sales during the SA period (Doc. 220) because such evidence likely would have showed Prakruti's breach of the SA.  Such sanctions included that Prakruti had to pay for Sabinsa

---

[8] The mention of solvent here concerns the manufacturing processes claimed in the '415 patent.  The Indian attorney was simply making it clear that, no matter the solvent used to make a Prakruti curcuminoid product—whether claimed in the '415 patent or not—the SA intended to restrict Prakruti's sale or offer for sale of all such products, regardless of solvent or process.

attorneys' fees and costs for discovering the spoliation ["spoliation fees"].  In addition, the Magistrate Judge determined Prakruti's behavior during the discovery warranted an adverse inference (also called a spoliation inference) against Prakruti at trial or upon a dispositive motion (such as this one), but expressly left the precise wording of the adverse inference to this Court.  To be clear, the Magistrate's recommendation of an adverse inference implied that Prakruti had breached the SA by selling during the SA period its curcuminoid products to others and had thwarted discovery of that breach by its intentional behavior to obfuscate information and spoliate evidence of such sales.  Up to this point, there had been no calculation of the spoliation fees amount.

### 1.4    Disputes Relating to the Adverse Inference-Spoliation Order and Spoliation Fees Amount

Immediately following the adverse inference-spoliation order (Doc. 220), Prakruti sought to appeal or minimize it.  On 31 December 2018, Prakruti timely filed a motion (Doc. 221) seeking reconsideration of the Magistrate Judge's adverse inference-spoliation order.   A month later, on 31 January 2019, an attorney for Sabinsa filed a declaration (Doc. 227) in support of an amount of spoliation fees that listed line-item charges for Sabinsa's patent attorneys at Arent Fox and for Sabinsa's general attorneys Saiber as well as discovery costs.  The requested  amount was in the area of a million dollars.

On 02 August 2019, the Magistrate Judge denied the request to reconsider the adverse inference/spoliation fee order. Doc. 235.  On 16 August 2019, Prakruti timely filed a composite appeal to this Court of the Magistrate Judge's adverse inference/spoliation order and her denial to reconsider. Doc. 236.  On  30 March 2020, this Court denied the composite appeal largely because Prakruti had applied an incorrect standard of review to the Magistrate Judge's findings of fact and decisions of law. Docs. 256-257

On 7  May 2020 (after the resolution of the adverse inference appeals), the Magistrate Judge heard oral argument from the parties on the amount of spoliation fees (Doc. 258) and on 19 May 2020, Sabinsa re-filed its attorney declaration of Doc. 227, now styled as a motion, in Doc. 262.

On 24 May 2021, the Magistrate Judge granted Sabinsa's motion for a specific amount of spoliation fees, parsing the award accordingly:  $15,150 for Sabinsa's Indian-law counsel; $96,750.50 for Saiber, its local counsel; and $879,724.20 for Arent Fox, its lead patent counsel; and $13,035.23 in costs. The total spoliation fees Prakruti had to pay equaled $1,004,659.83.  Doc. 264.

On 7 June 2021, Prakruti appealed the award to this Court (Doc. 266), arguing the Magistrate Judge had applied an incorrect legal standard in approving Sabinsa's spoliation fee.  In particular, Prakruti argued that, had the correct Third Circuit precedent been properly applied, then Arent Fox's

line-item charges should have been reduced to the current attorney fee rate for Camden, New Jersey. The Magistrate Judge's approval of the Washington DC forum rates of Arent Fox, Sabinsa's patent litigation and spoliation discovery firm, failed to meet Third Circuit precedent of *Interfaith Cmty. Org. v. Honeyfaith Intern, Inc.*, 426 F.3d 694, 705 (3d Cir. 2005).[9]  Prakruti contended Sabinsa's use of Arent Fox, as special discovery and specialized patent counsel, did not meet either of the two *Interfaith* exceptions and therefore, any Arent Fox line-item charges that were higher than the "forum rate" had to be reduced.

On 22 November 2021, this Court agreed the Arent Fox's spoliation fees had to be reviewed and remanded back to the Magistrate Judge for her finding of the proper definition of "forum" and a re-calculation accordingly.  All other fee determinations in her spoliation fee order remained unchanged. Docs. 278-279.  On 20 April 2022, the Magistrate Judge's order (Doc. 286) confirmed that Sabinsa's fee calculation had not met *Interfaith*'s exceptions and declared the relevant forum to be Camden, New Jersey and southern New Jersey.  Also, she meticulously had recalculated each line-item of Arent Fox attorney fees' according to the declared forum rates.  The recalculation of spoliation fees took the Magistrate Judge months and amounted in the end to a reduction of only about $1000.00.

On 4 May 2022, Prakruti appealed the Magistrate Judge's recalculation of the spoliation fees. Doc. 287-1.  On 5 December 2022, this Court denied (Doc. 295[10]) that appeal, largely because the Magistrate Judge had recalculated diligently all the Arent Fox attorney rates in line with the third quartile of rates for the Philadelphia, PA-Wilmington, DE region.[11]  In addition, this Court made clear in its denial that Prakruti could not argue simultaneously for and against the use of its expert-touted, objective database of forum rates, else out comes unintelligible clatter.  As a result, this Court affirmed that Prakruti owes Sabinsa $1,003,484.29  in spoliation fees.

### 1.5    Facts Leading to the Default and Relating to the Default Judgment Briefing

All appeals regarding the spoliation fee amount having ended, this Court raised the issue of

---

[9] The Magistrate Judge's proper application of *Interfaith* would have reduced all attorneys' fees, regardless of where they were located, to the 'rate of the forum', unless one of two exceptions applied.

[10] The essence of Prakruti's arguments were that the Magistrate Judge abused her discretion in determining reasonable rates for Arent Fox's attorney fees and specifically, by equating the third quartile attorney fee rates for the Philadelphia-Wilmington forum to those for Camden, NJ because she had wrongfully considered the following: Prakruti's spoliation misconduct, the complexity of the litigation, and prior sanctions on Prakruti.  Prakruti argued the Magistrate Judge's consideration of these "punishing factors" were why she had equated the "typically higher" Philadelphia-Wilmington forum rates to those of Camden NJ, which Prakruti asserted without any real-world attorney fee data, typically were not so high.

[11] This Court saw that the objectively derived database of attorney rates, the RRR, which Prakruti's own fee expert touted, supported the Magistrate Judge's reliance on the third quartile attorney rates of the Philadelphia PA-Wilmington DE region as a yardstick for the rates of the Camden, NJ-southern New Jersey forum.  However, Prakruti went on to advance non-credible arguments. It asked this Court to rely on the RRR as an objective fee-calculating tool for attorney rates in the Philadelphia-Wilmington region, but then did an about-face and asked this Court  to put aside the RRR in calculating rates for the Camden NJ forum, and instead to rely on a wholly unsupported assertion of a Prakruti "expert" on the "actual" fees in the Camden, NJ forum.

when the finalized amount of $1,003,484.29 was to be paid.  On 16 March 2023, the Court ordered (Doc. 307)  the parties to brief whether Prakruti must pay immediately or delay payment until final resolution of the breach of the SA.  On 30 March 2023, Prakruti's response implied that it was in poor financial straits and should not be required to pay immediately.  Doc. 311, Sealed.  Mindful of this document's sealed status, the Court asserts simply that Prakruti's brief was accompanied by a document that purportedly intended to show the extent of Prakruti's liabilities and inability to pay.  It purportedly was prepared by an unnamed bank manager in India but was unattached to a lawyer's declaration as to its actual authenticity and significance.  Most importantly, the information submitted had no relationship to a recognized accounting document, such as a balance sheet, income statement, cash flow statement, etc.  The accompanying document therefore lacked intelligible meaning to the Court, offered neither meritorious defense for Prakruti's non-compliance to the Payment Order nor support to Prakruti's request to stay payment of the spoliation fees.

On 5 April 2023, in its opposition (Doc. 317, Sealed), Sabinsa argued *inter alia* that Prakruti had not met the legal standard for staying the sanctions order--including paying the spoliation fees--nor offered a cogent, evidenced argument that it faced undue hardship to pay.  On 12 April 2023, the Court denied Prakruti's request to stay payment of the spoliation fees and ordered Prakruti to pay Sabinsa the full amount of $1,003,484.29 at the latest by 5:00 pm on 18 April 2023 ["the payment deadline"].  Doc. 322, "the Payment Order".   But, Prakruti failed to pay.

On 14 April 2023, in the midst of the dispute about the spoliation fee deadline, Prakruti's attorneys filed a motion to withdraw as counsel under the New Jersey Rule of Professional Conduct ("RPC") 1.6.  Doc. 323.  In asserting Prakruti had made execution of their legal representation unreasonably difficult, the attorneys disclosed no specific behavior that had prompted the motion.  Rather, they had attached to the motion an exhibit in which Prakruti had demanded its attorneys to immediately pay Sabinsa by the payment deadline, the remainder of their retainer, i.e. almost $9000.00.  The Court assumed the attorneys intended the exhibit to show that the complained-of, unreasonably difficult behavior was Prakruti's demand that its attorneys, with whom it was openly displeased, relinquish their retainer in partial payment of the spoliation fee.

On the payment deadline of 18 April 2023, almost as a confirmation of Prakruti's dispute with its lawyers, a Prakruti owner sent an *ex parte* email to Judge Kugler requesting either an opportunity to explain why its lawyers had done such a poor job of arguing for a stay of payment (and which presumably prompted the retainer turn-over to Sabinsa) or, in the alternative, an extension of the payment deadline.

On 24 April 2023, this Court issued a Show Cause Order (Doc. 327) for Prakruti to explain why this Court should not hold Prakruti in contempt for non-compliance with the payment deadline, which

this Court conducted as an in-person hearing on 1 May 23 and which included arguments on the attorneys' motion to withdraw.  Doc. 332, Sealed Transcript.  At the Show Cause hearing, Sabinsa argued Prakruti's contempt in not complying with the Payment Order should result in this Court's grant of default as a sanction against Prakruti and accordingly requested to change the upcoming briefing for summary judgment to a briefing on default judgment instead. Sabinsa asserted that the Court could assess the propriety of the liquidated damages amount for the quantity of Accused Product sold in breach of the SA, based on the Magistrate Judge's recommendation of an adverse inference.

On 3 May 2023, the Court issued an order (Doc. 331) that:

- Denied Prakruti attorneys' motion to withdraw;

- Declared Prakruti in Civil Contempt for failure to comply with the Payment Order ; and

- Directed the Clerk of the Court to enter default against Prakruti on Sabinsa's claim, now based in the Magistrate Judge's recommendation of adverse inference, of Prakruti's breach of SA.

On 15 May 2023, Sabinsa timely submitted this motion (Doc. 333) and a brief for Default Judgment (Doc. 334, Sealed), to which Prakruti timely opposed (Doc. 338, Unsealed) and Sabinsa timely replied (Doc. 341, Sealed).

**2.0   LEGAL STANDARDS FOR DEFAULT UNDER FED. R. CIV. PROC. 55(a)**

*Rule 55(a)* governs the entry of a default order and states a plaintiff can request the clerk's entry of default against a party that " has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise."  However, before imposing the extreme sanction of default, district courts must make explicit factual findings as to:

- whether the party subject to default has a meritorious defense;

- the prejudice suffered by the party seeking default;  and

- the culpability of the party subject to default.

*Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71 (3d Cir. 1987) *stating* "we have further required the district court to make explicit findings concerning the factors it must consider in rendering judgment by default or dismissal, or in declining to reopen such judgment." *Id.* at 74.  In weighing these factors, a court must appreciate that, like dismissal with prejudice, default is a sanction of last resort.  *Poulis v. State Farm Fire & Cas. Co.,* 747 F.2d 863 (3d Cir. 1984) *stating* "[w]e reiterate...that dismissals with prejudice or defaults are drastic sanctions".  *Id.* at  867–68.

**3.0    DISCUSSION: RELATING TO DEFAULT AND ADVERSE (SPOLIATION) INFERENCE**

In Section 1.0 above, the Court detailed the procedural history of this matter to base how It has

gotten to its Rule 55(a) default order and to this default judgment motion[12] as well as to point out why this is hardly a typical default situation, that is, one in which a defendant has not answered the complaint.

Ultimately, this Court's default order rests on Prakruti's lack of meritorious defenses at two important hearings:

- this Court's Show Cause hearing (Doc. 332, Sealed) where Prakruti was required to justify its violation of this Court's Payment Order of spoliation fees; and

- the Magistrate Judge's spoliation hearing (Doc. 218, Sealed) where Prakruti had to counter the Magistrate Judge's recommendation for an adverse inference of its breach of the SA and award of spoliation fees.

Put differently, this Court's default order arose from Prakruti's lack of meritorious defense for its contempt for non-compliance of the Payment Order and for its spoliation/obstruction of its third-party sales of "Accused Products" during the SA period. The Court finds detailing the procedural history of this matter shows with sufficiency Prakruti's defaulting behavior.

Since ordering the entry of default against Prakruti (Doc. 331), the Court has reviewed the parties' submissions on default judgment under *Rule 55(b)*, and finds that Prakruti's opposition (Doc. 338, Unsealed) advances several arguments more properly directed to the Default Order. The Court addresses those arguments here to fully and plainly make clear why Prakruti is in default under *Rule 55(a)*.

The Court outlines Prakruti's line of reasoning in its opposition to this motion, Doc. 338, Unsealed:

- Sabinsa Lacked Standing to sue for Patent Infringement under its License with the Patentee;

- Such Lack of Standing undermines this Court's jurisdiction over this matter since the expiry of the '415 Patent;

- In Prakruti's interpretation of the SA term "Accused Products, the curcuminoid products Prakruti sold outside the U.S. during the SA period cannot be "Accused Products" and therefore Prakruti's sales outside the U.S. cannot be Infringing and asserting Infringement for these sales goes against U.S. antitrust and patent misuse law;

- Also because of Prakruti's interpretation of "Accused Products", the SA, which purports to be a contract prohibiting "Worldwide" sales of Prakruti products to third parties during the SA period, is unenforceable.

---

[12] In particular:
- Prakruti's spoliation of evidence likely showing that some Prakruti curcuminoid sales during the SA period breached the SA, and which prompted the Magistrate Judge's recommendation of an adverse (spoliation) inference against Prakruti and order of spoliation fees and;
- Prakruti's failure to pay the spoliation fees by the Court-ordered deadline, for which this Court declared Prakruti to be in contempt and sanctioned Prakruti with a default order.

### 3.1    Prakruti's Lack of Standing and Lack of Jurisdiction Arguments

Prakruti argues the License Agreement between Sabinsa and the owner of the '415 patent ("owner" or "patentee") is a "bare" license[13] and not the exclusive license agreement Sabinsa claims it is.  Prakruti asserts this because, if the License did not grant Sabinsa the right to sue for patent infringement, then Sabinsa's 2014 patent infringement action was legally inappropriate; and, this Court can have no jurisdiction over this matter, including all the follow-on proceedings since termination of that litigation.

Prakruti is incorrect in its interpretation of the License grant to Sabinsa, especially as to  License ¶2.1, reproduced in the footnote.[14]   Contrary to Prakruti's interpretation and unequivocally, the License not only grants Sabinsa the right to practice the '415 patent but also at ¶2.1(b) grants Sabinsa the right to sue for infringement of that patent.  Moreover, Prakruti interprets License ¶2.1(c) to override ¶2.1(b), that is:  since Sabinsa is eligible to collect infringement damages that occurred ONLY BEFORE the execution of the SA (7 Jan 2015) (i.e., "past damages"), Sabinsa can have no right to sue for patent infringement AFTER execution of the SA.   Relying on this myopic reading of the entire ¶2.1 term, Prakruti's arguments amount to this syllogism:

1) the SA ended the patent litigation between the parties and the SA execution date is the dividing line between "past" damages for past infringement and "future" damages for future infringement;

2) since the allegedly breaching sales of "Accused Products" by Prakruti took place after the execution of the SA,  Sabinsa is now seeking not "past" damages, but "future" damages;

3) Sabinsa has no standing under the License ¶2.1(c) to collect such "future damages";

4) the unspoken and buried but wholly necessary bridging argument is that the SA term "Accused Products" necessarily means ONLY products claimed by the '415 patent.

Importantly, this syllogism falls apart if "Accused Products" means something broader, to wit: all curcuminoid products Prakruti sells, not just those covered by the '415 patent.

To expose Prakruti's faulty reasoning and pick apart this faulty syllogism, this Court first corrects Prakruti's misinterpretation of these two terms: the  grant in License¶2.1(b) and "Accused Product".

---

[13] A bare license grants only the ability to practice the patent, **without rights to exclude,** and thus lacks the constitutional standing of a patentee, i.e.,to sue for infringement. *Blue Gentian, LLC v. Telebrands Corp.*, Civil No. 13–4627 (FSH),2014 WL 2094089 D.N.J. 20 May 2014 [*citing  Morrow*, 499 F.3d [1332] at 1340–41 [Fed. Cir. 2007]; *and  WiAV Solutions*, 631 F.3d [1257] at 1267 [Fed. Cir. 2010], and *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1552 (Fed.Cir.1995) ("If the party has not received an express or implied promise of exclusivity under the patent, *i.e.,* the right to exclude others from making, using, or selling the patented invention, the party has a 'bare license,' and has received only the patentee's promise that that party will not be sued for infringement."). [emphasis added]

[14] **¶2.1 License Grant**. Licensor hereby grants to Licensee an irrevocable, fully-paid, royalty -free, exclusive license, under the Licensed Patent, to: (a) practice the claimed inventions in the Licensed Patent in every manner; **(b) sue third parties for patent infringement of the Licensed Patent**; and (c) obtain past damages from third parties for any infringement of the Licensed Patent.

### 3.2    Patent License ¶2.1(b): Standing and Jurisdiction

As for the grant in License ¶2.1(b), Prakruti argues the License never gave Sabinsa the rights of an exclusive licensee to stand in the shoes of the '415 owner and sue for infringement.  This is just incorrect.   Relevant Federal Circuit jurisdiction favors an interpretation that Sabinsa was  an exclusive licensee of the '415 owner because—counter to Prakruti's presumption—an exclusive licensee need not be an ONLY licensee or entity that may exercise a right to sue for patent infringement.[15]  To the point, the Federal Circuit has taught that:

> "[T]he key question in determining whether [a plaintiff licensee] has standing to assert the [owner's patents] against the Defendants is not, as the Defendants would have it, whether [the plaintiff licensee] has established that it has the right to exclude all others from practicing the patent. The question is whether [the plaintiff licensee] shown that it has the right under the patents to exclude the Defendants from engaging in the alleged infringing activity and therefore is injured by the Defendants' conduct."
> *WiAV Solutions v. Motorola, Inc.*, 631 F.3d 1257, 1267 (Fed. Cir. 2010).

*WiAV* is dispositive[16] here because it confirms the long-held proposition that an exclusive licensee is not necessarily a sole licensee.  Specifically, an exclusive licensee is not defined as such because it has the sole right, <u>even against the patent owner</u>, to sue for infringement of the licensed patent.  A patent owner's specific grant in a license spells out that specific patent right given to a specific licensee as well as the exclusivity over that right.  But, to be clear, licensees

---

[15] *See  WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265–67 (Fed. Cir. 2010) where the Federal Circuit ruled that an exclusive licensee had standing to pursue infringement claims for a collection of patents that were subject to **several prior** nonexclusive licenses, with the prior licensees having the right to sublicense their rights in the patent to their affiliates and a few other third parties, and could even transfer all of their rights in the patent if they sold their businesses.  The Federal Circuit had found that none of the named defendants were affiliates or third parties to whom those prior licensees could grant sublicenses, but exclusive licensees.. The *WiAV  court stated: "***This court … holds that an exclusive licensee does not lack constitutional standing to assert its rights under the licensed patent merely because its license is subject not only to rights in existence at the time of the license but also to future licenses that may be granted only to parties other than the accused." [emphasis added].**

And even before the Federal Circuit had been instituted, the Third Circuit clarified that a "bare" licensee can be an exclusive licensee.  *See Paul E. Hawkinson Co. v. Carnell*, 112 F.2d 396 (C.C.A. 3d Cir. 1940) ( *deciding* that the ruling party was an exclusive licensee having a right to involuntarily join the patentee in a patent infringement suit and *following Western Electric Co. v. Pacent Reproducer Corp.,* ., 42 F.2d 116, 119 (2nd Cir. 1930) to declare "Tiresoles, Inc., is an exclusive licensee, though not a sole licensee. The fact that a prior bare license was granted by Hawkinson Company to General Tire and Rubber Company does not render Tiresoles, Inc., any less an exclusive licensee." *Carnell*, 112 F.2d at 398.

*See also Dentsply Sirona Inc., Tulsa Dental Products LLC d/b/a Dentsply Sirona Endodontics, v. Edge Endo, Llc, Us Endodontics, LLC*, 1:17 CV1041-JFB-SCY, 2021 WL 1820211, *5–*6 (D.N.M. 2021) *denying* motion to dismiss for lack of standing for a first patent and *finding* that the plaintiff, as an exclusive licensee, had standing even though related subsidiaries also had the right to practice the patent and *stating:*
"The Court agrees that Plaintiffs have the right to sue under the [patent holder's] patents because  the patent holder expressly assigned that right to Plaintiffs. The Court also finds that plaintiffs have standing to bring this lawsuit. *See WiAV*, 631 F.3d at 1267 ('This court therefore holds that an exclusive licensee does not lack constitutional standing to assert its rights under the licensed patent merely because its license is subject not only to rights in existence at the time of the license but also to future licenses that may be granted only to parties other than the accused.'); *SonoSim, Inc. v. Medaphor Ltd.*, No. 16-2847, 2016 WL 7479363, at *2 (C.D. Cal. Oct. 17, 2016) ('An exclusive licensee is not necessarily the sole licensee of the patented technology….Rather, the patentee can grant many exclusive licenses, each consisting of different substantive rights.')".

[16] Prakruti's citation on pg. 9 of its opposition brief (Doc. 338) to *Propat Int'l Corp. v Rpost, Inc.*, 473 F.3d 1187, 1192 (Fed. Cir. 2007) is inapposite. Ownership by way of implicit or direct assignment need not be transferred to grant a patent licensee a right to sue for patent infringement.

may share exclusivity over the same patent rights. Put simply, an owner's license grant may give to a certain licensee the EXCLUSIVE right to MAKE the patent.  In a separate license to a different  licensee, the owner may give the EXCLUSIVE right to DISTRIBUTE the patented method or product.  But having granted those rights to exclusive licensees, the patent owner does not forfeit its own right to MAKE, DISTRIBUTE, SUE, etc.so  under the patent unless the license expressly so states. As in the situation here, the owner granted to Sabinsa the license to sue for infringement but did not give Sabinsa the only right to sue.  Nor was the owner required to do so in order to create an exclusive license.  Rather, the owner also retained for itself the right to sue for patent infringement but that retention of the litigation right did NOT take away Sabinsa's exclusivity as a licensee.

Thus, the correct syllogism under current Federal Circuit jurisprudence is:

As only the owner holds exclusionary rights to allow the practice of the '415 patent, and

As the owner has indeed granted Sabinsa such right expressly in License¶2.1(b),

THEN,

Sabinsa has Article III standing to bring a patent infringement suit for the '415 patent **without having to join the owner and without taking away the owner's right to sue;** and

Given the '415 owner's affirmative grant to Sabinsa to sue for patent infringement, and

Given that 35 U.S.C. §286[17] governs the statute of limitations for patent infringement claims,

THEN, Sabinsa had six years after the '415 patent expiry to sue for infringement that occurred after the License grant and during the SA period.

And to be clear, this license grant to sue for infringement is notwithstanding the limitation in the License at ¶2.1(c), relating to Sabinsa's grant to collect only "past" damages, that is, damages that occurred from infringement occurring before the execution of the SA.

As Sabinsa unequivocally had standing to sue for infringement of the '415 patent, this Court also unequivocally had jurisdiction over Sabinsa's patent infringement suit against Prakruti, including both subject matter jurisdiction because of Patent Act 35 U.S.C. § 281 *et seq.* and personal jurisdiction.  Moreover, Sabinsa and Prakruti in their Consent Judgment (Doc. 34 at ¶¶2,9), which ended the patent infringement suit between them, stipulated expressly that this Court retains jurisdiction over all matters related to that suit.  As this motion for default judgment relates directly to the breach of the Settlement Agreement that ended that suit, this motion is a litigation-related matter, over which the parties expressly consented this Court

---

[17] **35  U.S.** § 286. **Time limitation on damages (relevant section):**
Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.

retains jurisdiction.   Even more demonstrative of this Court's jurisdiction over Prakruti in this matter, the Settlement Agreement ¶6.4 states:  *"The Parties stipulate that if further judicial recourse related to this Agreement is necessary, they will submit to the jurisdiction of the Court and to the entry by that Court of an injunction enforcing all of the requirements, covenants, and promises set forth in this Agreement"*.  Thus, this Court has express personal and subject matter jurisdiction over not only the Settlement Agreement but also this motion for default judgment.

### 3.3     "Accused Products" in the Settlement Agreement ["SA"]

The SA defines "Accused Products" as *"any product(s) derived from the Curcuma longa plant that contains curcuminoids composition/product as enabled, described and claimed in the '415 Patent, including such Curcuma longa (Turmeric) product offered for sale by Prakruti."*  It also requires Prakruti  *"to cease, directly or indirectly, from importing, exporting, making, using, marketing, advertising for sale, or selling the Accused Product **worldwide** until after the expiration of the '415 Patent".*  [emphasis added].

Prakruti's opposition to this motion (Doc. 338) implies, without stating expressly, that  "Accused Products" <u>exclusively</u> means those curcuminoid products claimed in the '415 patent (Doc. 1, Exh 1),[18] i.e. a product that infringes the '415 patent.  Since the '415 patent included only one product claim, the product-by-process claim 17, then under Prakruti's interpretation of "Accused Products", any of its sold curcuminoid products must be <u>shown</u> to have been made by the steps in claim 17.

The Court sees that, if that "Accused Products" interpretation were really the basis of Prakruti's defense in these disputes, it is particularly telling Prakruti has never argued Sabinsa has failed to meet

---

[18] All claims of the '415 patent except no. 17 recite methods, which include:

    -methods for  preventing the formation of free radicals in a patient comprising administering curcuminoid products containing 75—81% curcumin, 15—19% demethoxy curcumin,and 2.2—6.5% bis demethoxy curcumin;

    -methods for isolating curcuminoids from turmeric rhizomes;  (this is basically a method of making curcuminoids);

    -methods for complexing curcuminoids with metals dissolved in a solvent that preferably is methanol;  (this is also  basically a method of making curcuminoids)

    -methods for  protecting biological tissues from damage, comprising administering a curcuminoid product comprising 75—81% curcumin, 15—19% demethoxy curcumin,and 2.2—6.5% bis demethoxy curcumin.

Method claims incur infringement liability generally when the resultant product of the method exhibits a "signature" element(s) that unambiguously identifies the recited method.

Even though claim 17 of the '415 patent recites a product, what's actually recited is a product-by-process claim, and infringed only by making/selling/using/offering for sale that product which is made exactly by the process steps recited in the claim.  Axiomatic patent practice teaches product-by-process claims offer very weak protection against infringement, are most often unenforceable, and deemed infringed ONLY IF the claimed product contains a "signature" element that unequivocally results from and identifies the claimed process.

Interestingly, the claims in the '415 patent for preventing free radicals and for protecting biological tissues are unpatentable in the European Patent Organization, and generally elsewhere, as methods of treatment claims.  The '415 patentee could never have gotten an EPO patent for these claims but would have been limited in Europe to only those claims for methods of making (as stated above) and the product-by-process claim.

its burden of proof to show Prakruti sold "Accused Products" that infringed claim 17. But, then again Prakruti could not argue this because, after all, Prakruti had spoliated any necessary evidence. Consequently, this Court does not assess whether the sold products at issue actually did infringe claim 17.  The Court finds such inquiry unnecessary primarily because, in the SA itself, Sabinsa promises not to sue Prakruti again for infringement of the '415 patent.[19]  By granting Prakruti a "get out of infringement" card, the four corners of the SA promote a broader and more accurate interpretation of "Accused Products" than Prakruti's.

Prakruti's narrow interpretation of "Accused Products" supports two contentions in its opposition (Doc. 338)  more aptly argued against the default order than against this motion.[20]  These are:

1) the SA cannot and does not govern any allegedly infringing sales Prakruti transacted after the expiration of the '415 patent.  This is because such sales as infringing the '415 patent constitute "future" infringement damages in violation of Sabinsa's license grant in License ¶2.1 (c)[21]; and

2) the SA is unenforceable under U.S. patent law, which prohibits the extra-territorial application of a U.S. patent grant.  Prakruti asserts the application of U.S. patent law to sales of U.S.-patented products outside the U.S. automatically invokes US patent misuse and antitrust jurisprudence and renders the SA unenforceable.

For the sake of argument, Prakruti allows that, even if Sabinsa did have standing to open up the SA to research a possible breach, License ¶2.1(c) prohibits Sabinsa's pursuit of damages under the SA. Since the relevant, allegedly-infringing Prakruti sales occurred after the execution of the SA, any request for damages for an SA breach claims "future" infringement damages, expressly prohibited by the License.  Besides, Prakruti asserts, even if Sabinsa somehow had a green light under the License to pursue such "future" infringement damages, U.S. patent law cannot and does not apply to Prakruti's sales outside the U.S.  Further, Prakruti declares if Sabinsa does assert U.S. law to the non-U.S. sales of "Accused Products", Sabinsa invokes patent misuse jurisprudence, i.e., largely U.S. anti-trust law.

The glaring problem with Prakruti's interpretation of "Accused Products" is its equating the clause "*including such Curcuma longa product offered for sale by Prakruti*" to mean only those curcuminoid products that infringe the '415 patent.   Although a *bona fide* contract interpretation dispute for "Accused Products" has not been raised, the Court expresses its construction of that term to ground its default decision already ordered in Doc. 331.

The Court's interprets "Accused Products" to include any curcuminoid product that Prakruti

---

[19] This Court makes no opinion as to the validity or enforceability of any of the '415 patent claims but acknowledges the generally recognized difficulties in enforcing product-by-process claims.
[20] To be clear,  the Court recognizes that these arguments of Prakruti's have been posed after the Court's default order and purportedly against the default judgment motion.  But,  as these arguments more properly oppose the default order, the Court takes them up in this section.
[21] which limits Sabinsa to "past" damages, i.e., infringement damages for sales made before the execution of the SA

sold/offered for sale during the SA period that may infringe the '415 patent <u>as well as any of its products that do not infringe</u>, either because the products fall outside the claims **or are sold outside the U.S**.

Matching Prakruti prohibitions in the SA with Sabinsa prohibitions in the License reveals the utter illogicality of Prakruti's interpretation of "Accused Products".   Under the License grant, Sabinsa may sue for infringement after the execution of the SA but cannot seek from Prakruti such "future damages."  However, during the SA period, if Prakruti sold only infringing products to third parties, then Sabinsa's attempts to collect liquidated damages would be prohibited as "future damages" under the License.   In other words, Prakruti's interpretation that "Accused Products" must mean only infringing products results in a complete vitiation of the SA liquidated damages clause.  Also, Prakruti's implicit interpretation of "Accused Products" violates New Jersey legal canons of contract interpretation and is nonsense[22] because PRAKRUTI SALES THAT BREACH THE SA DO NOT  INITIATE A PATENT LITIGATION SUIT.  Most importantly, in the SA, Sabinsa promised to dismiss the patent infringement lawsuit between the parties and "not to sue Prakruti for infringement of the '415 patent." Doc. 39-2:¶2.1, Sealed. Therefore, guided by  N.J. Supreme Court jurisprudence (*see* fn 22), this Court recognizes that the SA itself does not support Prakruti's interpretation of "Accused Products".

Accordingly, this Court finds that the SA term "Accused Products" means any such *Curcuma longa* product Prakruti offers for sale, whether such product could or did or not infringe the '415 patent.

Moreover, using this interpretation of "Accused Products", and regarding the SA as a whole and entire instrument that expresses the intent of the parties to settle the patent litigation,[23] the Court notes that the SA makes any sale of Prakruti curcuminoid products, in the U.S. or elsewhere, to any

---

[22] As New Jersey state law expressly governs the Settlement Agreement, this Court relies on that law to work through the implicit contract interpretation dispute over the "Accused Products" term.  The N.J. Supreme Court nicely encapsulated contract interpretation principles in *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 85 A.3d 947  (2014):

> We consider the [agreement at issue] in accordance with familiar rules of construction. Contracts should be read "as a whole in a fair and common sense manner." *Hardy ex rel. Dowdell v. Abdul–Matin*, 198 N.J. 95, 103, 965 A.2d 1165 (2009). Courts enforce contracts "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." *Caruso v. Ravenswood Developers, Inc.*, 337 N.J.Super. 499, 506, 767 A.2d 979 (App.Div.2001) [*citing Marchak v. Claridge Commons, Inc.*, 134 N.J. 275, 282, 633 A.2d 531 (1993)]. If the language of a contract " 'is plain and capable **959 of legal construction, the language alone must determine the agreement's force and effect.' " *Twp. of White v. Castle Ridge Dev. Corp.*, 419 N.J.Super. 68, 74–75, 16 A.3d 399(App.Div.2011) [*quoting CSFB 2001–CP–4 Princeton Park Corporate Ctr., LLC v. SB Rental I, LLC*, 410 N.J.Super. 114, 120, 980 A.2d 1 (App.Div.2009)]; *cf. Leonard & Butler, P.C. v. Harris*, 279 N.J.Super. 659, 671, 653 A.2d 1193 (App.Div.) [*noting* "the principle that unambiguous contracts will be enforced as written unless they are illegal or otherwise violate public policy"], *certif. denied*, 141 N.J. 98, 660 A.2d 1196 (1995). **Even in the interpretation of an unambiguous contract, we may consider "all of the relevant evidence that will assist in determining [its] intent and meaning**." *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 269, 901 A.2d 341 (2006)."

*Manahawkin*, N.J. at 118, 85 A.3d at 958-959. [emphasis added].

[23] The Court finds that this fuller interpretation of "Accused Products" arises directly from the parties' negotiations of and dealings with the Settlement Agreement, which reads on the N.J. Supreme Court's guidance for contract interpretation.  *See supra* note 22.  From the transcript and emails that lead up to, and comment on, the execution of the Settlement Agreement, all Prakruti wanted was "out" of the patent litigation Sabinsa had initiated in 2014, and which sought "past damages" for patent infringement within the confines of the License and against which Prakruti raised no serious defenses.  Prakruti argues that it was represented by an attorney that Sabinsa had engaged for it only  a month AFTER the signing of the SA.  Insinuating that its managers who signed the SA were unsophisticated and unwitting as to the actual import of the SA because they lacked legal representation during the SA negotiation, Prakruti paints Sabinsa as taking advantage in the SA, which otherwise infers its unconscionability.  This is discussed more fully below in the default judgment section.

third party a contract breach, not patent infringement, which gives rise to liquidated damages.

To sum this section that sets forth the Court's reasoning for declaring Prakruti in default, the Court applies the *Emcasco* factors[24] to those of Prakruti arguments more appropriately addressed to default.  Here, the most important factor is whether Prakruti is culpable.  There is no doubt that Prakruti spoliated/obstructed evidence of its curcuminoid sales during the SA period, which the Magistrate Judge inferred indicated Prakruti's breach of the SA.  Further, Prakruti failed to comply with this Court's order to pay Sabinsa the spoliation fees without good reason.  These facts point strongly to Prakruti's culpability.

Second, Prakruti's attempts to marshal "good reason" for its culpability reflect a complete lack of meritorious defense:  As for Sabinsa's standing over the original patent infringement suit, the plain and unambiguous language of the License Grant gave Sabinsa standing to sue in such an action as well as the authority to execute the Settlement Agreement.  As for *in personam* and subject matter jurisdiction over this motion,  the parties themselves granted this Court's continued and retained jurisdiction over all matters arising from their settlement to end the infringement litigation.  As for Prakruti's veiled attempt to define "Accused Products" so that the liquidated damages provision of the SA becomes void, this Court's correct application of New Jersey principles of contract interpretation reveals that this subterfuge only fails to justify its inferred SA breach and noncompliance with the Payment Order.

Moreover, as for Prakruti's  patent misuse and SA unenforceability arguments, a plain and proper reading of several inter-connected SA terms—"Accused Products"; Prakruti's prohibition to sell such products to 3rd parties during the SA period; and Sabinsa's promise not to sue in the future for patent infringement—call forth NO extraterritorial application of the '415 patent.  Thus, Prakruti's arguments why the default order regarding its  non-compliance with the Payment Order and resultant contempt have raised no meritorious defense.

Finally, that Sabinsa is prejudiced by Prakruti's failure to pay the spoliation fees is without question.  Sabinsa is not only out a million plus dollars in attorney fees but Prakruti's defaulting behavior points to its unwillingness to ever pony up.

Accordingly, since the *Emcasco* factors unanimously weigh towards default, this Court finds its default order (Doc. 331) legally appropriate.

---

[24] *Emcasco*, 834 F.2d at 74:
- whether the party subject to default has a meritorious defense;
-the prejudice suffered by the party seeking default;  and
-the culpability of the party subject to default.

**4.0     LEGAL STANDARD FOR DEFAULT JUDGMENT UNDER *RULE 55(b)***

Once a court directs the entry of a default, the plaintiff "may seek the Court's entry of default judgement under either *Rule 55(b)(1)* or *Rule 55(b)(2)*." *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008); *see also Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 521 n.1 (3d Cir. 1984): "Prior to obtaining a default judgment under either *Rule 55(b)(1)* or *Rule 55(b)(2)*, there must be entry of default as provided by *Rule 55(a)*."

Rule 55(b)(2) allows, upon a plaintiff's motion, a court to enter default judgment against a defendant that has failed to plead or otherwise defend a claim for affirmative relief.  A court should accept as true all well-pleaded factual allegations in the complaint by virtue of the defendant's default except for those allegations pertaining to damages. *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. Apr. 7, 2008) [*citing Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)].  A court does not adopt a plaintiff's *legal* conclusions because whether the facts set forth an actionable claim is for the Court to decide. *Doe v. Simone*, Civ. No. 12-5825, 2013 WL 3772532, at *2 (D.N.J. 17 July 2013)

Entry of a default judgment is largely a matter of judicial discretion, which is nonetheless "not without limits' " but for which the preference is "that cases be disposed of on the merits whenever practicable.' " *Chanel,* 558 F. Supp. 2d at 535 quoting *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984).  Once a party has defaulted, the consequence is that 'the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.' " *Teamsters Pension Fund of Phila. & Vicinity v. Am. Helper, Inc.*, No. 11-624, 2011 WL 4729023, at *2 (D.N.J. 5 Oct 2011) [*quoting DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 n.6 (3d Cir. 2005)].

In considering a default judgment, a court first must confirm procedural prerequisites, namely:

- its jurisdiction over both the subject matter and the parties;

- proper service of the defendant;

- that the complaint sufficiently pleads a cause of action; and

- whether plaintiff has proved damages.

*Moroccanoil, Inc. v. JMG Freight Grp. LLC*, Civil No. 14-5608, 2015 WL 6673839, at *1 (D.N.J. Oct. 20, 2015); *see Government Employees Insurance Co. v. Pennsauken Spine and Rehab P.C.*,  Civil No. 17-11727 (RBK/KMW),  2018 WL 3727369  (D.N.J. 6 Aug 2018).

Then, in making its substantive determination of default judgment, the court must also consider:

- prejudice suffered by the party seeking default;

- whether the party subject to default has a meritorious defense; and

- the culpability of the party subject to default.

*(Doug Brady, Inc.*, 250 F.R.D. at 177) and "resolve all doubt in favor of proceeding on the merits." *Ibid.* [*citing Zawadski de Bueno v. Bueno Castro*, 822 F.2d 416, 420 (3d Cir. 1987].

**5.0      DISCUSSION: DEFAULT JUDGMENT**

Having worked through its basis for Prakruti's default, (*see Heinz v. DuBell Lumber Co.*, Civil No. 19-8778 (RBK/EAP), 2022 WL 2833817 *1-2 (D.N.J. 19 Jul 2022); *see also Joe Hand Promotions, Inc. v. Forupk LLC*, Civil No. 19-07970 (RBK/KMW), 2020 WL 1864582  (D.N.J. 14 April 2020) ),[25] the Court now turns to resolving the motion at hand by first confirming the procedural pre-requisites, *viz.*,  jurisdiction over both the subject matter and the parties;  proper service of the defendant;  whether the complaint sufficiently pleads a cause of action; and whether plaintiff has proved damages.

As for this Court's subject matter and personal jurisdiction over Prakruti, see the above discussion in section 3.2.  The Court also finds Prakruti to be a competent defendant.   As for proper service to Prakruti and whether the complaint sufficiently pleads a cause of action, these pre-requisites are inapplicable here as this default situation does not arise from Prakruti's failure to answer the complaint.  As for whether Sabinsa has proved damages, this Court notes the adverse inference recommended by the Magistrate Judge implies Prakruti's breach of the SA and that such a breach calls up the liquidated damages clause.  Therefore, Sabinsa has shown damages have been incurred for an inferred breach of the SA.

In addition to these pre-requisites, a court must ensure  "the unchallenged facts" ... give rise to a "legitimate cause of action." *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008).  When satisfied a "legitimate cause of action" has arisen, a court moves to default judgment analysis: 1)  whether prejudice occurs to plaintiff if default judgment is denied, 2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct.  *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).  Upon granting default judgment, the court then turns to a determination of a proper award of damages. *Slaughter v. Moya*, No. 17-6767 (RBK/KMW), 2018 WL 3742622, at *1 (D.N.J. 7 Aug 2018).

**5.1      Adverse Inference and Legitimate Cause of Action**

This Court now looks into the adverse (spoliation) inference recommended  by the Magistrate-Judge in order to confirm that it properly infers a legitimate cause of action here, that is, Prakruti's

---

[25] From *Joe Hand Promotions*, 2020 WL 1864582 *at *1* (D.N.J. 14 April 2020):

"*Federal Rule of Civil Procedure 55(b)(2)* permits a court to enter default judgment against a party that has failed to answer or otherwise defend an action. *Anchorage Assocs. v. Virgin Island Bd. of Tax Review*, 922 F.2d 168, 177 n.9 (3d Cir. 1990). The Court should accept as true all well-pleaded factual allegations in the complaint by virtue of the defendant's default except for those allegations pertaining to damages. *Chanel, Inc. v. Gordashevsky*, 448 F. Supp. 2d 532, 536 (D.N.J. 2008) [*citing Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)]. The Court also does not adopt a plaintiff's legal conclusions because whether the facts set forth an actionable claim is for the Court to decide. *Doe v. Simone*, No. 12-5825 (JHR), 2013 WL 3772532, at *2 (D.N.J. July 17 2013).

The decision about whether default judgment is proper 'is left primarily to the discretion of the district court.' *Bailey v. United Airlines*, 279 F.3d 194, 204 (3d Cir. 2002) (internal quotation omitted). Nevertheless, there is a well-established preference in the Third Circuit to decide cases on the merits. *See Hritz v. Woma Corp.*, 732 F.2d 1178, 1180–81 (3d Cir. 1984)".

breach of contract.  This Court first looks to the parties' arguments for insight into each party's definition of the inference, as well as opposition or support of it.  Prakruti advances no direct arguments against the Magistrate Judge's recommendation but focuses instead on how the Settlement Agreement either cannot be breached or is unenforceable.  Prakruti's unstated argument is that the adverse inference is meaningless if the Settlement Agreement cannot be, and therefore has not been, breached.

  Sabinsa seeks the same inference the Magistrate Judge recommended,[26] noting nothing has occurred since then to alter the recommendation.  Accompanying its default judgment brief, Sabinsa provides Exhibits (Doc. 341, Exhs. 3,5,7,and 9,Sealed) that are Prakruti invoices of its sales of curcuminoid products to third parties during the SA period and which support the inference so long as the sold products are deemed "Accused Products".

Having interpreted above in section 3.3 that any curcuminoid product Prakruti sold during the SA period is an "Accused Product",  this Court finds the Prakruti curcuminoid products invoiced in Exhibits (Doc. 341, Exhs. 3,5,7,and 9, Sealed), and any spoliated evidence of sales the Magistrate Judge found, can only be "Accused Products".   This evidence necessarily infers a breach of the SA and calls up the SA liquidated damages term.

Accordingly, the Court formally adopts the Magistrate Judge's recommendation of an adverse (spoliation) inference that Prakruti breached the Settlement Agreement.

The Court's adoption of the adverse inference arises not only from the Magistrate Judge's recommendation but also from Prakruti's lack of meritorious defense against the inferred SA breach. In particular, even if any Prakruti curcuminoid product sold in breach of the SA were indeed claimed in the '415 patent, there is no rational argument that these specific sales violate U.S. antitrust or patent misuse law.   The SA does not demand a patented product to be sold.  Rather, it states only that a third party sale of a Prakruti product possibly claimed in the '415 patent raises a breach of the SA.  Simply, by restricting Prakruti from selling any curcuminoid product to third parties—claimed in the '415 patent or not--and Prakruti AGREEING to that restriction, the SA does not violate U.S. patent misuse law.[27]  The SA in no way indicates that U.S. patent infringement triggers its breach.  Rather, an SA breach is plain and simple:  Prakruti's unrestricted sale to third parties of its curcuminoid products during the SA period.

Moreover, and tellingly, the SA itself states that Sabinsa will not institute a patent infringement litigation against Prakruti.  The implication is that sales of Accused Products are not raising a  patent

---

[26] that Prakruti's spoliation of batches of its sold product to third parties during the SA period and other discovery obstructions warranted an inference that Prakruti had breached the Settlement Agreement.

[27] While appreciating that the term "Accused Products" is typically used in a patent infringement context to identify infringing items, the Court understands how this term in the SA could have led Prakruti to interpret that any product it sold during the SA period was infringing the '415 claims.  However, as discussed in the body, Prakruti's interpretation is too narrow, given the broader definition of this term in the SA itself.

infringement claim, regardless of whether the sold product is covered by a claim of the '415 patent.

Accordingly, the Court's adoption of the adverse inference from Prakruti sales of curcuminoid products during the SA period and, for which the Magistrate Judge found evidence of spoliation, grounds a "legitimate cause of action" (*Gordashevsky*, 558 F. Supp. 2d at 536), breach of the Settlement Agreement, upon which to base default judgment.

### 5.2    Default Judgment Analysis

Working through the Third Circuit's *Chamberlain* factors for analyzing default judgment, the Court finds that for point 1)—possible prejudice to plaintiff—denial of the default judgment motion would seriously prejudice Sabinsa.  An important consideration is that Prakruti's past conduct—to wit, Prakruti's failure to comply with the Payment Order and pay Sabinsa the one million dollar-plus spoliation fee award—may predict its future conduct and force Sabinsa to seek enforcement in an Indian court of law of any damages judgment issued here.

As for point 2)—Prakruti's litigable defense—the Court finds Prakruti has no meritorious or litigable defense, as discussed in Sections 3.0 and 5.1.

As for point 3)—whether Prakruti's delay is due to culpable conduct—the Court considers all of Prakruti's laggard and foot-dragging conduct telling and dispositive, especially:
-its refusal to appear in person for the Show Cause hearing (Doc. 332, Sealed) on 1 May 2023;
- its apparent refusal to heed the advice of its current attorneys to pay the spoliation fees; and,
- its *ex parte* email to this Court, which blames its attorneys for insufficient effort to show Prakruti's inability to pay and also implies its attorneys, not Prakruti itself, were culpable for its failure to pay.

To be blunt, Prakruti did not pay the spoliation fee simply because they did not pay.  There is no hidden meaning here and no meritorious justification or defense.  Just as there is no hidden meaning behind Prakruti's conduct in selling  its curcuminoid products to third parties in breach of the SA or behind its efforts to hide/spoliate evidence of these sales in order to avoid liability.

Accordingly, the Court having found that Prakruti breached the Settlement Agreement and finding its already-issued default order and now default judgment for Sabinsa legally appropriate, the Court grants Sabinsa's motion for default judgment.

### 5.3    Analysis of  "Reasonableness" of the Liquidated Damages Clause and Amount of Damages

The only issue remaining in this motion is the enforceability of the liquidated damages clause and therefore the amount of damages owed by Prakruti for the SA breach.  As SA ¶9.2 specifies that New Jersey law governs disputes, the Court looks to New Jersey Supreme Court jurisprudence and

acknowledges its nuanced standard for the enforceability of liquidated damages clauses.

Specifically, although the New Jersey Supreme Court has declared that a contract term setting an unreasonably large liquidated damage amount is a penalty,[28] and unenforceable on grounds of public policy (*Rosen v. Smith Barney*, 195 N.J. 423, 426-427 (2008) [*quoting MetLife Capital Financial Corporation v. Washington Ave. Associates L.P.*, 159 N.J. 484, 498–99 (1999); *and Wasserman's Inc. v. Twp. of Middletown*, 137 N.J. 238, 247–48 (1994)], there is no blanket prohibition to liquidated damages clauses under New Jersey state law.  Rather, in considering factors favoring liquidated damages clauses vs. those opposing, the New Jersey Supreme Court has concluded:

> " '[i]n commercial transactions between parties with comparable bargaining power, stipulated damage provisions can provide a **useful and efficient remedy**. Sophisticated parties acting under the advice of counsel often negotiate stipulated damages clauses **to avoid the cost and uncertainty of litigation**. Such parties can be better situated than courts to provide a fair and efficient remedy. Absent concerns about unconscionability, **courts frequently need ask no more than whether the clause is reasonable."**
> *MetLife*, 159 N.J. at 504 [quoting *Wasserman*, 137 N.J. at 253.]  [emphasis added].

Also, in relying on *Wassenaar v. Panos*, 331 *N.W.*2d 357, 361 (1983), the *MetLife* Court found a stipulated damages clause enforceable.  Unnder the totality of the circumstances, the clause was reasonable and highlighted that judicial economy and freedom of contract favor enforcement of these clauses.  *MetLife*, 159 N.J. at 504.  In the end, the *MetLife* court declared that its decision in *Wasserman* exemplified a proper analysis of a stipulated damages clause:

> "Treating **reasonableness 'as the touchstone,'** we noted that the
> **difficulty in assessing damages,**
> **intention of the parties,**
> **the actual damages sustained, and**
> **the bargaining power of the parties**

all affect the validity of a stipulated damages clause. *Id.*[*Wasserman*, 137 N.J.] at 250–54."
*MetLife*, 159 N.J. at 495.  [emphasis added].

Therefore in considering the "reasonableness" of the SA liquidated damages clause under New Jersey state law, this Court weighs the above four factors.

A first factor—difficulty in assessing the damages amount—is a light lift as calculating the liquidated damages demanded in the SA is simply to multiply the number of kilos included in the

---

[28] Moreover, the New Jersey Supreme Court defined penalty as that sum a party agrees to pay in the event of a breach, but which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach.

adverse inference by $10,000 per kilo, as stated in the liquidated damages clause.  Mindful not to disclose sealed information, the Court notes there is documentation that suggests Prakruti likely sold to third parties over 5000 kilograms of curcuminoid products during the SA period.  Doc. 39-2, Sealed. However, the Magistrate Judge had found evidence of Prakruti spoliation /obstruction for only four of these sales, and only those sales with spoliation/obstruction evidence grounded her adverse inference.

Since the Magistrate Judge found Prakruti had spoliated/obfuscated evidence of 1,504 kilograms of sold curcuminoid products,  1,504 kilos times $10,000 per kilo equals the $15,040,000 in liquidated damages Sabinsa seeks.

However, from a broader view, assessing the damages amount may be more difficult and may call for a weightier balancing. From the four corners of the SA, the Court sees that Sabinsa's business strategy was to demand the prohibition on Prakruti's third party sales in order to re-route Prakruti's curcuminoid customers through Sabinsa, thereby giving Sabinsa access not only to increased amounts of curcuminoid sales but also possibly to Prakruti's customer list.  Thus, this balancing must weigh Sabinsa's handing Prakruti a pass on patent litigation damages in exchange for Sabinsa's expectations of increased curcuminoid product revenue (Sabinsa's Reply, Doc. 341, Sealed) and includes what appears to be Sabinsa's presumption that a very high liquidated damages amount would deter Prakruti's possible breach of the SA.

From this view, it's quite difficult to know whether the liquidated damages calculus—$10,000 per kilo for each kilo sold in breach of the SA—achieved Sabinsa's desired result, i.e., locking in Sabinsa's competitive advantage for the last eighteen months of the '415 patent period and thereby giving Sabinsa some indirect payback for Prakruti's infringement.  Such information would support the "reasonableness" of the liquidated damages rate clause.  The difficulty in assessing the damage amount arises because neither party has supplied to the Court any estimate to show how Prakruti's sales to Sabinsa could offset Sabinsa's losses and make the liquidated damages a less punitive, more justifiable, and therefore reasonable amount.  Such estimates would include:  Prakruti's patent infringement damages; the increase in profit Sabinsa expected from selling curcuminoid products directly to Prakruti's customers; and whether Sabinsa added in the litigation fees and costs when calculating the measure of increased profit that would surpass Prakruti's infringement damages.

The Court finds that, without such evidence, this factor is relatively unhelpful, i.e., neutral, as to whether the SA liquidated damages clause is or not "reasonable."

This balancing of Sabinsa's actual infringement losses vs. expected increased profit vs. a need to deter Prakruti's possible breach of the SA leads to the factor of the intent of the parties.   The record

shows that U.S. counsel[29] for Prakruti questioned the relevant Prakruti C-level manager about the implications and meaning of the liquidated damages clause <u>at least one month after</u> the execution of the SA and that Prakruti's manager affirmed he understood those implications.[30]  Not entirely demonstrative of Prakruti's intent <u>during the SA negotiation</u>, this evidence, nonetheless, points to Prakruti's understanding and acceptance of the liquidated damages term and implies Prakruti had to know that sales to third parties would incur such damages.

The Court finds this second factor a vague indication of the "reasonableness" of the SA liquidated damages clause, and while not ignoring it, gives it little weight.

As for a third factor, <u>parties' bargaining power</u>, Prakruti asserts its lack of counsel <u>during</u> the SA negotiation means the SA was not negotiated between entirely equal business partners.  Prakruti implies the Prakruti manager who signed the SA cannot have been aware of the ultimate effect of the liquidated damages clause.  But as discussed above, the Sabinsa-acquired attorney appears post-SA execution to have clarified for its client Prakruti the effect of the liquidated damages clause were Prakruti to breach the SA.  The Court also sees that Prakruti, desirous to end the infringement litigation without having to pay damages upfront, may have viewed the SA as both a gain as well as a minimal loss in revenue, given that the SA sought Prakruti's exclusivity of sales to Sabinsa for only 18 months.[31]

Again, without knowing the extent of infringement damages for which Prakruti may have been liable, it is unclear how unequal the bargaining power was between the parties. If the infringement damages were still inchoate or unknowable at the time of settlement, then, by wiping Prakruti's liability slate clean, Sabinsa had a somewhat greater bargaining position because Prakruti would have been unable to calculate its revenue loss by settling.  Prakruti therefore would not have known whether signing the SA was rational or at least avoided a major loss.

But, if the infringement damages were in any way estimable, then Prakruti could have calculated the difference between its revenue losses incurred by selling only to Sabinsa in contrast to the infringement damages.  Such a calculation would have given Prakruti a more balanced understanding of its gain and loss in signing the SA, and thus a more balanced bargaining power.  The Court nonetheless accrues a somewhat greater bargaining power to Sabinsa simply because Prakruti was unrepresented by counsel <u>during</u> SA negotiation but became adequately represented  a month later and because Prakruti's C-suite manager communicated his clear understanding of why the liquidated damages clause was in place.  *See* Doc. 338-10, Sealed.

---

[29] Hired and paid for by Sabinsa.

[30] *See* Doc. 338-8: 10, Sealed.

[31] The record shows Prakruti's C-level manager understood that the Settlement Agreement was NOT a general settlement but a limited settlement based on Prakruti's obligation to sell its curcuminoid product to Sabinsa until expiry of the '415 patent.  *See* Doc. 338-10, Sealed.

Finding this factor not particularly telling of the "reasonableness" of the SA liquidated damages clause but recognizing Sabinsa's greater bargaining power during SA negotiation, the Court nonetheless notes this factor tilts slightly against the "reasonableness" of the SA liquidated damages clause.

As for the final factor, <u>actual damages sustained by Sabinsa for Prakruti's breach of the SA</u>, these are calculated as the total amount of the breaching sales to which the Magistrate Judge applied the adverse inference, which is $154,280. This compares with the liquidated damages Sabinsa seeks for these same sales: $15,040,000, that is, 100 (or $10^2$) times the amount supported by the adverse inference. The difference between the liquidated damages and actual damages is $14,885,720, on its face enormous, and why Prakruti asserts the SA liquidated damages clause is not "reasonable" but rather unenforceable as a contractual penalty prohibited under New Jersey contract law and public policy.[32]

Having considered previously the issue of unreasonable penalty clauses (in a dispositive motion), this Court stands on its holding in *Sempra Energy Solutions, LLC v. Executive Campus, LLC*, 10–cv–02060 (RBK-JS), 2012 WL 503736 (D.N.J. 15 Feb 2012):[33]

> Under either New York's or New Jersey's law, "liquidated damages are considered a penalty when they do not reflect the actual or probable damages that a non-breaching party will suffer due to a breach, but instead, attempt to punish a party for a breach or dissuade that party from breaching in the first place.

*Id.* at *4. [*relying on Rosen v. Smith Barney, Inc.*, 195 N.J. 423, 950 A.2d 205, 207 (N.J.2008)].

In *Sempra*, we found the termination damages clause of the relevant contract to be reasonable. Like the SA liquidated damages clause here, the *Sempra* termination clause charged a very large and variable termination fee if the contract were breached. The *Sempra* plaintiff had shown by replicable calculation what its losses were because of the defendant's breach of the contract. Even though large, the *Sempra* termination damages made the plaintiff whole for its losses due to defendant's breach. *Sempra*, 2012 WL 503736 at * 4 (D.N.J. 15 Feb 2012). Moreover, since the *Sempra* plaintiff had justified with replicable mathematical calculation as well as transparent logic the amount of termination damages, this Court deemed

---

[32] *See supra discussing Rosen v. Smith Barney, Inc.*, 195 N.J. 423, 950 A.2d 205 (2008), which stated: " 'A penalty is the sum a party agrees to pay in the event of a breach, but which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach.' (citation omitted); *accord Restatement (Second) of Contracts* § 356 (1981). As we have recognized, in that context, a contractual term fixing an unreasonably large liquidated damage amount is a penalty, which is unenforceable on grounds of public policy. *MetLife, supra,* 159 N.J. at 498–99, 732 A.2d 493; *Wasserman's Inc., supra,* 137 N.J. at 247–48, 645 A.2d 100." *Rosen*, 195 N.J. 427, 950 A.2d 207.

[33] Where the only issue to be resolved was whether the defendant, whose contract breach was uncontested, had to pay the contractually-stipulated termination payment, and if so, how much it should be. Defendant's primary argument was that the $305,163 termination fee for Ds terminating the contract through its breach was a penalty and against the public policy of the State of New Jersey. *Sempra*, 2012 WL 503736 at *2, 4 (D.N.J. 15 Feb 2012).

the *Sempra* termination damages clause "reasonable" and accordingly denied defendant's request for mitigation of the termination fee.  *Id*. at *5.

The *Wasserman* four-factor balancing test draws out facts, conclusions, and presumptions that neither unequivocally support the "reasonableness" of the SA liquidated damages clause nor clearly point to its unreasonableness.  Unlike in the *Sempra* case, this Court has no inkling whether the very large liquidated damages amount that Sabinsa seeks has a rational and reasonable relationship to its contract losses plus a reasonable pay-back that makes forgiving Prakruti its patent infringement damages economically practical.

Accordingly, the Court rules that the parties may brief with restraint the precise issue of how the SA liquidated damages amount is or not rationally related to and therefore "reasonable" or "unreasonable" relative to the actual damages Sabinsa sustained because of the evidenced, breaching sales.

## 6.o   Conclusion

In reviewing in depth its order of default against Prakruti, this Court has shown the legal propriety of it.  Based on that legal propriety and the adverse inference adopted from the Magistrate Judge's recommendation and other reasons stated herein, this Court grants Sabinsa default judgment against Prakruti because Prakruti breached the Settlement Agreement and has not marshalled a meritorious defense for doing so.

Although acknowledging Sabinsa is owed some measure of liquidated damages for the SA breach, the Court finds the "reasonableness" of the liquidated damages clause in the SA has yet to be been shown. The Court invites the parties to brief and evidence specifically how the SA liquidated damages clause satisfies the fourth factor of the *Wasserman* test.  In particular, the parties must show how the requested liquidated damages amount, regardless of the amount each party seeks, is reasonable relative to the actual damages of the breaching sales of the SA.

The parties' briefs shall be due 21 days after this Order and Opinion have been filed.

Dated: 6 November 2023                                  /s Robert B. Kugler

                                                                    The Honorable Robert B. Kugler
                                                                    United States District Judge